IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

PAUL KEVIN CURTIS                                                                  PLAINTIFF

vs.                                                                      Cause No. 1:16cv009-SA-DAS

THE UNITED STATES OF AMERICA
JOHN MARSHALL ALEXANDER,
Individually and in his Official Capacity,
JOHN DOES 1-15                                                  DEFENDANTS

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
JURY TRIAL DEMANDED

COMES NOW, PAUL KEVIN CURTIS, Plaintiff herein, by and through counsel and files this, his Complaint for Violation of Civil Rights, stating the following, to-wit:

Introduction

This a complaint for damages against the United States government, particularly the Federal Bureau of Investigation, the United States Attorney's Office, and the Department of Justice/Homeland Security. John Marshall Alexander is sued in individually and in his capacity as the Criminal Chief for the United States Attorney's office for the Northern District of Mississippi. There remains the possibility of other defendants becoming evident through the discovery process. The defendants conspired and acted in concert with one another to deprive plaintiff of his constitutionally protected rights. These actions arose over two years ago following the attempted poisoning of the President of the United States and others by the mailing of the toxic substance, Ricin, through the postal service.

JURISDICTION

Jurisdiction is based upon 28 U.S.C. §§1331 & 1343, as well as 42 U.S.C. §1983, et. seq., and under the parallel federal constitutional jurisdiction established by the United States Supreme

Court in Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971); as well as the Federal Tort Claim Act (28 U.S.C. §1346(b)). Plaintiff has exhausted all administrative remedies prior to the filing of this complaint by filing his Notice of Claim under the Federal Tort Claim Act. More than six months have passed since the administrative claim was made. As of this date no response has been received and Plaintiff elects to proceed via litigation.

PARTIES

Plaintiff: The plaintiff is Paul Kevin Curtis, a resident of Corinth, Alcorn County, Mississippi.

Defendants: The acts and omissions alleged against the United States of America were performed by employees of the United States. Those employees were, to plaintiff's knowledge and belief, employees of the Federal Bureau of Investigation, the Department of Homeland Security and/or the Department of Justice. John Does 1-15 are individuals whose names are suspected, but not fully known, and who will be identified during the course of the litigation. John Marshall Alexander is sued in his official capacity as an Assistant United States Attorney as well as in his individual capacity.

STATEMENT OF FACTS

<u>Background</u>

1. Paul Kevin Curtis (hereinafter referred to as "Kevin") is a native Mississippian and entertainer who was living in Corinth, Alcorn County, Mississippi, in April 2013. Kevin received Social Security disability payments and supplemented his income through live vocal performances as well as the sell of his music CDs. Kevin frequently used social media to advocate various causes and concerns. During his use of social media Kevin used certain phrases, such as "I am KC and I approve this message" as well as the quote "To see a wrong and

not expose it, is to become a silent partner to its continuance." Kevin often closed his postings with either or both of these phrases. A simple internet search reveals Kevin had used these quotes as far back as 2003. In fact, the government states as much in its affidavit for the arrest of Dutschke: "This statement is found frequently in Curtis's online postings, as any visitor to Curtis's Facebook page would know." (USA v. Dutschke USDC No. 3:13MJ0020, Document #1).

2. On April 16, 2013, the Jackson Division of the FBI was advised that the United States Senate Mall Facility in Landover, Maryland had identified an envelope which contained a type-written letter and a suspicious granular substance. The letter was addressed to "Snator (sic) Roger Wicker, 555 Dirksen Senate Bldng, Washington DC 20510". Senator Wicker is an elected official representing the State of Mississippi whose primary residence is in the Northern District of Mississippi. No return address was identified on the envelope and it was postmarked in Memphis, Tennessee, on April 8, 2013. Contained in the envelope was a letter containing the following language: No one wanted to listen to me before. There are still/Missing Pieces' Maybe I have your attention now Even if that means someone must die. This must stop. To see a wrong and not expose it, is to become a silent partner to its continuance I am KC and I approve this message.

3. According to the United States government, law enforcement sought information from Senator Wicker's office about constituents or complainants who might have the initials "KC". The government claims that Senator Wicker's office provided the name Paul Kevin Curtis. The government further claimed that Kevin Curtis sent multiple mailings to Senator Wicker and other political officers, all containing the phrases that appeared in the Ricin letters. The government

also learned from local authorities that Kevin had "been investigated" and that many years before his ex-wife described him as "delusional".

4. Based on those speculations and accusations, the United States government, by and through the full force of its law enforcement agencies, and at the direction of John Marshall Alexander, the criminal chief of the United States Attorney's Office, destroyed the life of Kevin Curtis.

The Arrest

5. On April 17, 2013, Kevin Curtis was living his life quietly while honing his entertaining skills and caring for his children. A father of four, Kevin played an active role in the lives of his children from their birth forward.  On the afternoon of April 17th  Kevin planned to travel approximately twenty (20) miles to Booneville, Mississippi, to cook dinner for his children and his former wife. It was a Wednesday evening and Kevin planned to help with homework and church activities. This was a normal course of action for Kevin and his former wife, Laura Curtis. Kevin loaded some food into his car and also gathered his small dog, Moo Cow, for the short drive.

6. Upon leaving his driveway Kevin approached his mailbox to check his mail. At that exact moment his life changed forever. In the blink of an eye he was literally swarmed by countless men in SWAT gear with automatic weapons drawn. The swarm yelled at him, barked orders and cursed him as they cuffed and shackled him. Kevin was in a state of shock, as was Moo Cow, who ran away in the melee. Kevin asked multiple times for someone to help with his dog but his requests were unheeded.

7. The army of GI Joe looking men began interrogating Kevin on the spot. Kevin answered

every question truthfully and without hesitation, despite his obvious shock and fear. He was put in the back of a black unmarked SUV and driven to Oxford, Mississippi. (Kevin learned later where he was taken. He had no idea at the time where he was going and the officers/agents did not offer any information.) There were demands to search his home and Kevin begged the army of men to search his home as he had nothing to hide. These government agents then searched Kevin's automobile and home, completely wrecking his home and damaging his vehicle.

8. Once the convoy stopped, Kevin was taken inside a building and handcuffed to a chair. Numerous individuals interrogated him, demanding that he admit his guilt in a Presidential assassination plot. Kevin answered their questions, but not to their satisfaction. Kevin was confused and could not comprehend the purpose of their actions. He was literally jerked out of his car and hauled away in an unmarked car by people whose identity were unknown to him. His dog ran away and he was not allowed to make a call or to communicate with anyone in the outside world. At some point Kevin made the now infamous statement "I don't even eat rice" in response to their accusations and allegations about Ricin. Kevin offered to take a polygraph examination and that offer was ignored. Kevin suggested perhaps he should talk to a lawyer and that suggestion was discouraged.

9. As the evening wore on, more and more people interrogated Kevin. Each successive one was more forceful than the one before. At some point a federal agent - believed to be FBI Agent Brandon Grant told Kevin there was a young woman in the hospital clinging to life and that she would die if Kevin did not tell him what was in the poison. This, of course, was just an outright lie. There is no other way to characterize that line of questioning other than to say that the United States Government, in an effort to obtain a confession that they believed was necessary to their case, lied and lied and lied some more.

10. Kevin was in the unenviable position of being accused of a horrific crime he did not commit. He was told countless times he would spend the rest of his life in prison. He was berated and chastised, harassed and lied to. The agents used everything short of water boarding to force a confession from Kevin Curtis. . . .all based on something he posted on Facebook. To believe Kevin Curtis was guilty, one would have to believe that he didn't care if he got caught and that he wanted to get caught.

11. Despite this gargantuan leap of logic and reality and based on a substandard investigation, the government persisted.  In particular, John Marshall Alexander, in his capacity as criminal chief of the United States Attorney's office directed the investigation and called for the arrest of Kevin Curtis, despite the appalling lack of evidence.  Having set their jackboot clad feet on a course of action, they were unwilling to turn around. On Thursday morning, April 18, 2013, Kevin appeared before United States Magistrate Judge S. Allan Alexander, charged as a terrorist trying to kill the President and other government officials. The government asked that he be detained without bond. The Judge signed a temporary detention order and set the next hearing for Friday, April 19, 2013, at 3:00 p.m. The Judge initially mentioned setting the case for the following Monday to give the defense adequate time to prepare. However, counsel undersigned asked the Court to set it sooner rather than later and the Court obliged.

Defense Counsel Meets With The Government and Solves the Case

12. Following the meeting counsel for Kevin Curtis met with Assistant United States Attorney Chad Lamar concerning the charges against Kevin. AUSA Lamar was very confident that Kevin was guilty.  He informed counsel undersigned that they would be introducing proof that Kevin had made threats against a church and that he had no doubt that Kevin was guilty as

charged. Lamar advised there was proof of multiple occasions of threats by Kevin Curtis. Counsel undersigned Neilson wrote a name on a piece of paper and passed it to AUSA Lamar with the strong suggestion that the government investigate the person listed. The name, of course, was James Everett Dutcshke, the true perpetrator of the crime. AUSA Lamar laughed and said the government was well aware of Dutschke but "they had their guy." AUSA Lamar was acting at the direction of defendant Alexander.

13. Friday April 19th was a lovely Spring day in Oxford, Mississippi, home to the country's "Most Beautiful College Campus", the University of Mississippi. Among blooming flowers and exercising co-eds, the media began to assemble. Associated Press picked up the release from the FBI that "FBI Special Agents arrested Paul Kevin Curtis, the individual believed to be responsible for the mailings of the three letters sent through the U.S. Postal Inspection Service which contained a granular substance that preliminarily tested positive for ricin." Counsel undersigned was preparing for the afternoon hearing when they were summoned to the federal courthouse to the chamber of (then) Chief District Judge Michael P. Mills.

Defense Team is Summoned to Chambers of the Chief Judge

14. Counsel appeared as directed and met with Judge Mills and AUSA Chad Lamar. AUSA Lamar brought a motion and a proposed order in the Curtis case that would subject Kevin Curtis to a psychological evaluation in the custody of the Bureau of Prisons. Counsel undersigned objected to the motion. The government argued that Kevin was "unbalanced" and "not mentally stable". AUSA Lamar stated repeatedly that the government merely wanted to "protect the rights of Mr. Curtis". Judge Mills noted that Kevin Curtis had counsel who was able to determine if he was competent to understand the proceedings, and further, that it was the duty of his counsel to

insure his rights were protected.

15. The government was unpersuaded that counsel undersigned was able to protect Kevin's interests and insisted on a hearing to determine whether or not Kevin should be subjected to a psychological evaluation courtesy of the Bureau of Prisons and the United States Government. Judge Mills advised the government that he would be happy to hear their petition on a day the following week.  The government insisted that the probable cause hearing be continued until such time as a hearing could be held to determine whether Kevin Curtis was competent to understand the proceedings against him. Counsel undersigned assured the government and the Court that they had conferred with Kevin at length as well as his friends and family members and that they were confident of his competence and ability to understand the proceedings against him.

16. The government continued to insist that the probable cause hearing be continued indefinitely until the Court could hold a hearing to determine competence. Judge Mills declined to accept the government's position and was clear that he would not intervene and stop the hearing scheduled by Magistrate Alexander.  Judge Mills made the statement that even if the government was correct and Kevin was incompetent that "even incompetent defendants are entitled to due process."  AUSA Lamar, acting at the direction of defendant Alexander was adamant that the afternoon hearing not occur.  Plaintiff now knows that at the very time the meeting was taking place with Chief Judge Mills, government agents had uncovered numerous leads that indicated Plaintiff was NOT GUILTY and further, that James Everett Dutchske was the perpetrator of the crime.  Again, defendant Alexander, acting as criminal chief, directed the continued prosecution of Plaintiff.

The Motion to Continue

17. The Judge dismissed the meeting and counsel undersigned continued preparing for the afternoon probable cause hearing. Shortly thereafter counsel received a Motion to Continue the probable cause hearing. The motion was received via the electronic docketing program of the United States District Court and was a complete surprise to the defense. Counsel undersigned spoke with AUSA Lamar several times on Thursday, April 18, 2013, including a conference at the U.S. Attorney's office referenced, supra, when AUSA Lamar was advised that James Everett Dutschke was the likely perpetrator of the crime. Counsel spent well over an hour with AUSA Lamar in judge's chambers as AUSA Lamar argued vehemently that the probable cause hearing must be continued on the basis that Kevin Curtis was incompetent to understand the proceeding. The government never indicated a lack of readiness for the probable cause hearing. To the contrary, Mr. Lamar was very clear in his certainty that Kevin Curtis was the terrorist who committed these heinous acts and that the government could and would prove it.

18. The government's motion urged the Court to delay the proceedings so that the hearing could be as "complete and thorough as possible." The motion referenced subpoenas that needed to be answered and searches that needed to be conducted or were not complete. Defense counsel adamantly opposed the motion in a written response as well as at the time of the hearing.

The Judge Denies the Government's Motion

19. When the hearing commenced the government again urged the Court to delay the proceedings against Kevin Curtis. The government stated more time was needed to prepare their case. The Court disagreed and made note of the fact that the government's burden of proof was extremely low and that all the parties were there and available for the hearing; therefore the

hearing would proceed as scheduled.

20. The government's witness was FBI Special Agent Brandon Grant. Agent Grant is a very capable agent with impeccable credentials and extensive experience in the field of terrorism. Agent Grant was adamant that Kevin Curtis was the perpetrator of the crimes and in fact, he stated, under oath, more than once that he was 100% confident of Kevin's guilt.

The Hearing Cannot be Concluded

21. The hearing was well underway but by no means complete as the clock edged toward the 6:00 p.m. hour. The Court noted that it was highly unlikely the hearing could be completed that evening. The Court expressed dismay that Kevin Curtis would remain in jail over the weekend without a resolution to the complaint, but it was clear to everyone that there was simply no other alternative. Furthermore, the government advised the Court that searches were ongoing at Kevin's home and that the result of those searches would be available on Monday. It is more likely that the result was already known to the government, at least the preliminary result. It is believed that defendant Alexander was well aware on Friday evening that the search of Curtis's home revealed no evidence of any wrongdoing.

22. Kevin was frightened by the prospect of spending the weekend in jail. He had been taken from his quiet life and thrust into the spotlight as the man who tried to kill the President, a United States Senator and a local judge. He was concerned for his safety in jail, as well as the safety of his family. Counsel undersigned shared his concerns but were secure in the fact that the ongoing searches would reveal what they already knew: Kevin Curtis was an innocent man. As it turns out, Defendant Alexander and the other government agents knew or had reason to know that Kevin Curtis was an innocent man at the time they watched him being taken back to the jail for

the weekend in custody. In fact, it appears the weekend was devoted to finding something, anything, to give credibility to an incredible arrest. Rather than considering the fact that a mistake was made and attempting to remedy the mistake, the defendants turned their concentration towards an event in Chicago, Illinois, that transpired more than two decades earlier. It was their intent to use that event to somehow persuade the judge - or the general public - that Kevin Curtis was a dangerous individual.

The Weekend

23. Over the weekend counsel undersigned made several efforts to speak with representatives of the government. Defense counsel sought information about the searches that were being conducted at Kevin Curtis's home. The government represented to the Court that the searches were ongoing and would be probative in determining probable cause against Kevin Curtis. The government did not respond to counsel undersigned's requests for information concerning the searches. Counsel undersigned sent an investigator to the Curtis home on Saturday to check the status of the searches. The house and the surrounding area were deserted. Despite no official word of the futility of the search, logic dictated that had ricin or any hazardous materials been found the property would be cordoned off and covered with decontamination teams as well as evidence collection teams. It is clear that the defendants, particularly defendant Alexander knew by Saturday, April 20th, there was absolutely no proof of a crime committed by Kevin Curtis. There was no evidence of ricin or ricin manufacture at Curtis's home. There as no evidence Kevin Curtis had been out of Corinth, Mississippi, during the time the letters were mailed. In fact, his computer tracking information showed the exact opposite. Government agents had descended on Corinth and interviewed (and sometimes intimidated) employees of every facility

where public printing and copying was available, including office supply companies and the public library. Their efforts revealed absolutely nothing to indicate Kevin Curtis had printed or copied anything in the weeks prior. Furthermore, the search of Kevin's home corroborated Kevin's statements - he had not manufactured ricin. He had not mailed letters - he didn't even have a printer.

24. Counsel undersigned reached out to the government numerous times over the weekend to discuss the circumstances and how the matter could be concluded. Counsel was confident that the government would recognize the serious lack of evidence against Kevin Curtis and release him immediately. Counsel had advised Kevin that his release would not stop the investigation against him. To the contrary, the investigation could (and would) continue with the full forces and resources of the United States government. The difference would be that his liberty would not be compromised or denied during the investigation.

25. On April 21, 2013, at approximately 10:30 p.m., counsel undersigned spoke with AUSA Lamar by telephone. AUSA Lamar acknowledged that the searches of Kevin's home and computers had yielded no evidence of ricin preparation or manufacturing. Counsel undersigned truly believed that the government would recognize its mistake and release Kevin Curtis. The government refused to consider the possibility of a mistake and AUSA Lamar advised counsel undersigned that they were proceeding with their theory that Kevin Curtis mailed ricin to the President of the United States, Senator Roger Wicker and Justice Court Judge Sadie Holland.

26. Counsel undersigned had one question: what was the proof? AUSA Lamar advised that the government had strong evidence that Kevin Curtis had committed the crimes. Specifically AUSA Lamar explained that tests had been conducted on the envelopes containing the suspected ricin. According to AUSA Lamar, the envelopes contained an imprint of Kevin Curtis's address

in the upper left hand corner. AUSA Lamar explained that experts would testify that the particular envelopes had been in a stack of envelopes and that Kevin Curtis's address had been written in the upper left hand corner of envelopes at the top of the stack. According to AUSA Lamar, this evidence solidly linked Kevin Curtis to the envelopes used in the attack.  As of this filing that evidence has not been provided and there is no reason to believe it exists, since it would be impossible for Kevin Curtis to have written on envelopes that were used by James Everett Dutschke.

The Hearing Resumes

27. Court resumed on Monday with FBI Special Agent Brandon Grant returning to the witness stand for cross examination.  Throughout the morning he maintained he was "100 percent positive" that Kevin Curtis was the perpetrator of the crime. Despite this confidence, he readily admitted there was not a shred of evidence that linked Kevin Curtis to the crime. Agent Grant and the government focused on Kevin's mental state - alleging that Kevin was possibly bi-polar and mentally unstable. Additionally, the envelope evidence never materialized yet the government refused to back away from their position and would not consider a dismissal of the charges.  In fact, when the Court recessed for the noon break, AUSA Lamar approached counsel undersigned with a stack of papers approximately an inch thick.  Counsel undersigned again inquired if the government would simply agree to release Kevin and continue their investigation? AUSA Lamar laughed and said he had plenty of evidence to prove Kevin's guilt and dropped the stack of papers in front of counsel undersigned.  When asked what evidence AUSA Lamar said "Chicago" and walked away.

      Agent Grant has made the statement that Kevin Curtis had been involved in a "hostage

situation" in Chicago. That was a lie. Kevin was involved in a suicide situation when he threatened to kill himself with a gun in Chicago and the police intervened. That occurred in 1992. Yet it was the heart and soul of the defendants' case against Kevin. As if an emotional tragedy two decades prior had any bearing whatsoever on the identity of the terrorist who sent ricin to the United States President.

The Government Seeks Yet Another Delay

28. After the noon recess Kevin Curtis was returned to the courtroom where he was able to conference with counsel undersigned. AUSA Lamar and his colleagues were not in the courtroom. Defense counsel was called to judge's chambers where several government attorneys were gathered, including AUSA Lamar and Defendant John Marshall Alexander who was then the Criminal Division Chief and First Assistant United States Attorney Bill Martin. AUSA Lamar stated that the government needed to stop the hearing due to some evidence uncovered that could be potentially beneficial to Kevin Curtis. However, the government wanted to keep Kevin Curtis in custody while they investigated the fact that he was innocent. The government did not want to share their information and the defense team was extremely skeptical. However, based solely on the statement of AUSA Lamar, counsel undersigned agreed to the continuance as long as the matter would be resolved the next morning. Counsel undersigned trusted AUSA Lamar and relied on that trust to agree to the delay.

The Morning of April 23, 2013 and the Demands of the Criminal Chief

29. On April 23, 2013, counsel again gathered in Magistrate Alexander's chambers. The government, led by John Marshall Alexander, informed the Court that they were unwilling to

share the "new" evidence and they again wanted to delay the proceedings. Counsel undersigned objected and stated that unless they were prepared to release Kevin Curtis immediately that the hearing would resume. It was abundantly clear to the most casual observer that the government's case had failed to materialize and that there was no credible evidence to implicate Kevin Curtis. Yet AUSA Alexander demanded that Kevin remain incarcerated.

30. Counsel undersigned had learned through various resources that the government knew as early as Friday that there was no trace of ricin found in Kevin Curtis's home, his car, or his possessions. The government was well aware of the fact that not a single reference to ricin appeared on any computer owned or possessed by Kevin Curtis. The government was unable to find any yellow paper (similar to the yellow paper sent to the officials) in Kevin Curtis's possessions, nor were they able to locate any place where Kevin Curtis could have made copies of the letters. They certainly knew that Kevin Curtis did not have a printer or a copier in his home. They interviewed/interrogated/harassed area library employees as well as employees of local print shops and office supply businesses and the government came up completely empty. Despite the glaring lack of evidence, the Chief of the Criminal Division of the United States Attorney's office showed up on Tuesday, April 23, 2013, and demanded that Kevin Curtis be held without bail unless he agreed to the following conditions:

1. Post a $10,000.00 bond;

2. Release to his parents custody with electronic home monitoring; and

3. Waive his constitutional right to a speedy trial.

Kevin's defense counsel declined and insisted that the hearing resume or the charges be dismissed and Kevin released immediately. Defendant Alexander stated "That is our offer. If he wants out, he will take it." Counsel then excused themselves to go and visit with their

client in preparation for the hearing.

31. While visiting with Kevin in the U.S. Marshal's holding facility counsel was summoned into the hallway by AUSA Chad Lamar. AUSA Lamar stated "We will release Kevin. Will you give me until 5:00 to file the official motion to dismiss?" Kevin and his defense team was exasperated by the actions of the government. It had been clear since Friday that the government had major concerns about their case. It was obvious no later than Saturday that Kevin Curtis was completely innocent of the charges against him. Yet the government had persisted in their quest to convict this man, or at the very least, to subject him to an inpatient mental health evaluation while in custody of the United States Bureau of Prisons.

32. Counsel undersigned had quite literally begged United States Attorney Felicia Adams to simply release Kevin Curtis while the investigation was ongoing as he was not a threat to the community at large or any one person individually. Counsel repeated her request in two separate written communications between April 19th and April 22nd, advising that Kevin Curtis was presuming the government was acting in good faith and that mistakes were made. As of the filing of this complaint and more than two years later, Ms. Adams has not shown the professional courtesy to respond or even acknowledge the letters, let alone say anything about the travesty her office brought upon the life of Kevin Curtis. Since that time counsel undersigned has learned that Ms. Adams was completely removed from the investigation and was allowing defendant Alexander to direct the investigation. Defendant Alexander was adamant that Kevin Curtis, a man he had reason to believe was innocent, and **in fact, likely knew he was innocent,** continue to be held in the custody of the United States. There is no justification for such action. There were many alternatives available to Defendant Alexander and those under his authority. They could have easily investigated Kevin without keeping him in a cage. In fact, they did just that for

James Everett Dutchske. The investigation against Dutschke was thoroughly conducted and completed prior to taking Dutschke into custody. Yet Defendant Alexander denied Kevin that right, simply because he refused to acknowledge the mistake he committed through the recklessness of his office and of those under his direction.

The Release of Kevin Curtis

33. Kevin Curtis's only objective on April 23, 2013, was to be let out of the cage the government had shoved him as if he were a dangerous animal. He simply wanted to go home, find his dog, and return to his life. Only due to the trust of AUSA Lamar was counsel undersigned willing to allow the government the concession of a 5:00 motion to dismiss. Counsel undersigned was (and continues to be) perplexed by the fact that the chief of the criminal division of the United States Attorney's office was unwilling to simply release an innocent man, and insisted on the continued incarceration knowing that person was innocent and misled counsel undersigned as well as the Court, not to mention the general public through the media that was covering the case in droves. Be that as it may, counsel undersigned agreed to the offer of AUSA Lamar. Kevin was immediately released from the custody of the United States Marshals and AUSA Lamar followed through with his word and filed the motion to dismiss before the 5:00 p.m. hour. The order of dismissal was entered "without prejudice", presumably to allow the investigation against Kevin Curtis to continue.

The Arrest of Dutschke

34. The true perpetrator was arrested a few days after Kevin's release. To no one's surprise, the identity of the criminal was the name given to AUSA Lamar by defense counsel Hal Neilson

on April 18, 2013 - James Everett Dutschke. To the surprise of Kevin Curtis, it appeared that the government actively investigated Dutschke without arresting him, quite unlike the treatment bestowed upon Kevin.  Furthermore, it was clear the government had been in possession of evidence implicating Dutschke since at least April 19, 2013. Yet four days later, on April 23, 2013, the division chief of the criminal division of the United States Attorney's office demanded that Kevin Curtis remain in the custody of the United States.  This demand was completely and wholly without basis and was not supported by any reasonable evidence.  Defendant Alexander set aside any sort of reasonableness and common sense in furtherance of his goal: to prosecute Kevin Curtis; and later, to protect the reputation of the United States Attorney's office by attempting to paint Kevin Curtis as a criminal.  To this day the defendants have failed to offer any apology or explanation to Kevin Curtis.

The Aftermath

35. Kevin Curtis was released to a different world from the one he was taken from a week before. He was suddenly cast into the national and global media as a terrorist. His home was destroyed, his possessions were ransacked and taken. He was placed on the "no fly" list and was subjected to humiliating delays and searches at the airport.

36. Kevin was unable to have peace and quiet in his own home as he was bombarded with strangers gawking and asking questions. His music career came to a screeching halt and he was unable to book events. The government has refused over and over to remove the language "without prejudice" from the order of dismissal. Kevin continues to suffer from extreme emotional distress caused by his false arrest and wrongful incarceration.

CAUSES OF ACTION:

37. Plaintiff adopts all preceding facts, statement and allegations as if fully incorporated therein. The United States of America, by and through its agents, officers and representatives, all or some, in whole or in part, conspired with one another, while under color of law, to deny Paul Kevin Curtis the rights guaranteed by the United States Constitution, particularly Amendments One, Four and Six. Further, Defendant, under color of law, worked to deprive Paul Kevin Curtis of the rights guaranteed by 42 U.S.C. §1983.  Defendant Alexander directed the investigation an is personally and officially responsible for the damage brought upon Kevin Curtis due to his failure to demand an investigation prior to arrest; and later for his refusal to simply acknowledge the lack of evidence against Kevin and release him.

38. The United States of America, by and through its agents, officers and representatives, acting under color of law, caused injury to Paul Kevin Curtis in that he was denied his right to be free from unlawful search and seizure, he was subjected to wrongful and false prosecution, false arrest and wrongful incarceration.

39. Plaintiff suffered physical, mental, emotional and financial damages through the actions of the Defendant, specifically, through the denial of his constitutionally protected rights to be safe and secure in his life/home without unwarranted government intrusion.  Defendant Alexander acted under color of law, but against the rule of law, in directing the prosecution and incarceration of Kevin Curtis.

40. At all times material hereto, the Defendant was vested by with the authority and the non-delegable responsibility of adhering to, complying with, and enforcing the laws of the United States of America. Consequently, while acting under color of law, the Defendant commenced to engage in a course of conduct and to implement a policy, custom, use, plan, or practice wherein

the rights, privileges, or immunities of Paul Kevin Curtis were violated.

41. As a direct and proximate result of the aforementioned customs, policies and/or practices of the said Defendant, Paul Kevin Curtis suffered injuries and damages as alleged herein.

## PRAYER FOR RELIEF

THEREFORE, in light of the above misdeeds of the Defendant, Plaintiff prays for a judgment against Defendants as follows:

A. Compensatory damages in a sum to be determined by a jury;

B. Punitive damages in a sum to be determined by a jury;

C. Pre-judgment interest;

D. Reasonable attorneys fees and expenses; and

E. Costs of this action.

Plaintiff demands trial by jury, and respectfully prays this Honorable Court for such other and further relief as may be just.

Respectfully submitted,

/s/Christi R. McCoy
Christi R. McCoy, MS Bar #9986

/s/Philip H. Neilson
Philip H. Neilson, MS Bar #3798

Christi R. McCoy, Esq.
1739 University Avenue, No. 252
Oxford, Mississippi 38655
662-513-6366
mccoylawfirm@gmail.com

Philip H. Neilson, Esq.
Post Office Box 1860
Oxford, Mississippi 38655
662-832-8070
attorneyhalneilson@gmail.com